IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

JOSEPH LOUIS D'ALESSANDRO, III,
      Plaintiff,

vs.                               Case No.:  3:17cv97/LAC/EMT

J. COKER, et al.,
      Defendants.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Joseph Louis D'Alessandro, III ("D'Alessandro"), an inmate of the Florida Department of Corrections ("FDOC"), is proceeding pro se and in forma pauperis in this civil rights action.  Presently before the court is D'Alessandro's Second Amended Complaint (ECF No. 11) and motion for entry of default and default judgment against Defendants Coker, Taylor, Stephens, and Rosati (ECF No. 50). Defendant Rosati filed a response in opposition to the motion for default and a motion for enlargement of time to respond to D'Alessandro's Second Amended Complaint (ECF No. 52).  Defendants Gaynor, Schrock, Coker, Stephens, and Taylor filed motions to dismiss D'Alessandro's claims (ECF Nos. 34, 47, 48).  D'Alessandro responded in opposition to the motions to dismiss (ECF Nos. 39, 53, 54).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters.

*See* N.D. Fla. Loc. R. 72.2(E); *see also* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b).

Upon consideration of the parties' motions, the undersigned concludes that D'Alessandro's motions for default and default judgment should be denied, and Defendants' motions to dismiss should be granted.

## I.   BACKGROUND

D'Alessandro's Second Amended Complaint names the following six Defendants, all of whom were members of the staff at Santa Rosa Correctional Institution when the events at issue occurred:  Warden J. Coker, Lieutenant G. Taylor, Lieutenant J. Gaynor, Lieutenant Schrock, Sergeant W. Stephens, and Nurse Rosati (*see* ECF No. 11 at 2–3).[1]  D'Alessandro claims that Defendants violated his Eighth Amendment rights on April 5, 2016, by applying a chemical agent and failing to provide adequate decontamination measures, including a "full body" shower and access to water in his cell (*id.* at 6–9).  D'Alessandro seeks declaratory relief and nominal damages (*id.* at 9).

All Defendants have been served with process.  As previously noted, Defendants Schrock, Gaynor, Coker, Stephens, and Taylor have filed motions to dismiss.  Nurse Rosati requested additional time to file a response to the Second

---

[1] The page references are to the page numbers automatically assigned by the court's electronic filing system rather than the page numbers of the original documents.

Amended Complaint (*see* ECF No. 52).  Defendant Rosati also filed a motion to re-open discovery for a limited purpose and limited period of time (ECF No. 55).  The court granted the latter motion and re-opened the discovery period until April 5, 2018, for the limited purpose of Defendant Rosati's obtaining medical and grievance records from the Florida Department of Corrections (ECF No. 56).

## II.   D'ALESSANDRO'S MOTIONS FOR ENTRY OF DEFAULT AND DEFAULT JUDGMENT

### A.   Applicable Legal Standard

Rule 55(a) of the Federal Rules of Civil Procedure requires the clerk of the district court to enter a "default" when a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise.  Fed. R. Civ. P. 55(a).  Additionally, Rule 55 provides that if the plaintiff's claim is for "a sum certain or a sum that can be made certain by computation," the clerk of court, on the plaintiff's request, with an affidavit showing the amount due, must enter judgment for that amount and costs against a defendant who has been defaulted for not appearing and who is neither a minor nor an incompetent person.  *See* Fed. R. Civ. P. 55(b)(1).  In all other cases, such as the instant case, the plaintiff must apply to the court for a default judgment.  *See* Fed. R. Civ. P. 55(b)(2).  If the party against whom a default judgment is sought has appeared

personally or by a representative, that party or its representative must be served with written notice of the application at least seven (7) days before the hearing.  *Id.*  The court may conduct hearings or make referrals when, to enter or effectuate judgment, the court needs to conduct an accounting, determine the amount of damages, establish the truth of any allegation by evidence, or investigate any other matter.  *Id.*

Rule 55(c) of the Federal Rules of Civil Procedure provides that a court may set aside an entry of default for "good cause" shown.  "'Good cause' is a mutable standard, varying from situation to situation."  Compania Interamericana Export-Import, S.A. v. Compania Dominicana, 88 F.3d 948, 951 (11th Cir. 1996). The good cause standard is a "liberal one."  Perez v. Wells Fargo N.A., 774 F.3d 1329, 1337 n.7 (11th Cir. 2014) (citing Compania, 88 F.3d at 951).  The Eleventh Circuit has identified a number of factors relevant to the good cause analysis:

> [W]e evaluate various factors that may be applicable in a given case.  *See id.*  For example, courts generally consider whether the default was culpable or willful, whether setting it aside would prejudice the non-moving party, and whether the defaulting party may have a meritorious defense.  *Id.*  Depending on the circumstances, courts have also considered factors such as "whether the public interest was implicated, whether there was significant financial loss to the defaulting party, and whether the defaulting party acted promptly to correct the default."  *Id.* (citation omitted).  On the other hand, where a party demonstrates an intentional or willful disregard of the judicial proceedings, good cause to set aside the default does not exist.  *Id.* at 951–52.

<u>Perez</u>, 774 F.3d at 1337 n.7 (citing <u>Compania</u>, *supra*).

     B.    <u>Relevant Facts</u>

Defendants Gaynor and Schrock were served with a summons and copy of the Second Amended Complaint on September 25, 2017 (*see* ECF Nos. 21, 22), and had sixty days (by Monday, November 27, 2017) to file a responsive pleading (*see* ECF No. 13).[2] Counsel for Defendants Schrock and Gaynor filed notices of appearance on October 31, 2017, and a motion to dismiss on December 4, 2017 (ECF Nos. 24, 25, 34).  D'Alessandro filed a response in opposition to the motion on December 18, 2017 (ECF No. 39).

Defendant Stephens was served on September 27, 2017 (*see* ECF No. 15), and had sixty days to file a responsive pleading (by Monday, November 27, 2017). Defendant Taylor was served on November 30, 2017 (*see* ECF No. 37), and had sixty days  to file a responsive pleading (by Monday, January 29, 2018) (*see* ECF No. 27). Defendant Coker was served on December 4, 2017 (*see* ECF No. 41), and had sixty days to file a responsive pleading (by Friday, February 2, 2018) (*see* ECF No. 27). On February 22, 2018, counsel for these Defendants filed notices of appearance and motions to dismiss (ECF Nos. 44, 45, 46, 47, 48).  The same day, D'Alessandro filed

---

[2] The clerk's office was inaccessible due to the Thanksgiving holiday on Friday, November 24.

motions for entry of default and default judgment against Defendants Coker, Stephens, Taylor, and Rosati (ECF No. 50).

Defendant Rosati was personally served on December 12, 2017 (*see* ECF No 38), and had twenty-one days to file a responsive pleading (by Tuesday, January 2, 2018) (*see* ECF No. 30).[3]  On March 1, 2018, counsel for Defendant Rosati filed a notice of appearance, and a response in opposition to Plaintiff's motions for default and default judgment which included a request for enlargement of time to file a responsive pleading (ECF Nos. 51, 52).

C.     Discussion

In Defendant Rosati's response to D'Alessandro's motion for default, Rosati states she honestly believed she did not need to respond to the Second Amended Complaint, because the process server told her so (*see* ECF No. 52 at 2).   Rosati argues that although the court has not entered a default, the following grounds for setting aside a default are present:  (1) she has meritorious defenses; (2) she acted promptly upon D'Alessandro's filing the motions for default and default judgment;

_____

[3] Defendant Rosati did not timely waive service, even though she was provided an opportunity to do so (*see* ECF Nos. 20, 29); therefore, she had only twenty-one days within which to serve an answer, *see* Fed. R. Civ. P. 12(a)(1)(A).

(3) the reason for her default was not willful; and (4) D'Alessandro will suffer no prejudice, because other Defendants' motions to dismiss are still pending (*id.* at 3).

The undersigned agrees that even if the court granted D'Alessandro's motions for default and default judgment as to Defendant Rosati, doing so would be futile because, applying the "good cause" standard, there would be good cause to set aside the default. Rosati's failure to respond to the complaint does not demonstrate the sort of culpable and willful misconduct that warrants the denial of a motion to set aside default. Rosati's counsel states that he learned of this case on February 28, 2018, just two days after the clerk of court docketed D'Alessandro's motion for default, and counsel immediately contacted Defendant Rosati, who informed counsel of her belief as to what the process server told her (i.e., that she did not need to respond to the pleading) (*see* ECF No. 52 at 2). The next day, on March 1, 2018, counsel responded to D'Alessandro's motion for default. There is no indication of willful disregard of the judicial proceedings on Defendant Rosati's part.

Additionally, Defendant Rosati may have meritorious defenses, for example, failure to exhaust administrative remedies and/or qualified immunity. And there would be no discernible prejudice to D'Alessandro if the court entered, and then set aside, the default. *See* Lacy v. Sitel Corp., 227 F.3d 290, 293 (5th Cir. 2000) ("There

is no prejudice to the plaintiff where the setting aside of the default has done no harm to plaintiff except to require it to prove its case."). Because granting D'Alessandro's motions for default and default judgment would be futile as to Defendant Rosati, D'Alessandro's motions should be denied as to that Defendant.

None of the other Defendants against whom D'Alessandro seeks a default, i.e., Coker, Stephens, and Taylor, has responded to the motions for default and default judgment. Despite the failure to respond, Defendants have not intentionally or willfully disregarded the judicial proceedings—in fact, all of them filed motions to dismiss. Further, each of them has a meritorious defense, as discussed *infra*. Therefore, D'Alessandro's motions for default and default judgment should be denied as to Defendants Coker, Stephens, and Taylor as well.

## III.   DEFENDANTS' MOTIONS TO DISMISS

### A.   Applicable Legal Standards

#### 1.   Motion to Dismiss

Motions to dismiss for failure to state a claim are governed by Rule 12(b)(6). In applying that rule, the allegations of the complaint are taken as true and are construed in the light most favorable to the plaintiff. *See* <u>Davis v. Monroe Cnty. Bd. of Educ.</u>, 120 F.3d 1390, 1393 (11th Cir. 1997). "Pro se pleadings are held to a less

stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed." Boxer X v. Harris, 437 F.3d 1107, 1110 (11th Cir. 2006).  The court may consider documents attached to a complaint or incorporated into the complaint by reference, as well as matters of which a court may take judicial notice.  *See* Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007); Saunders v. Duke, 766 F.3d 1262, 1272 (11th Cir. 2014); Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116 F.3d 1364, 1369 (11th Cir. 1997) ("[W]here the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal . . . .").

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quotation and citation omitted).  A claim is plausible on its face where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citation omitted).  Plausibility means "more than a sheer possibility that a defendant has acted unlawfully."  *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability,

it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quotation and citation omitted).

The determination of whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Iqbal, 556 U.S. at 679 (citation omitted).  The pleader is not entitled to relief "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct."  *Id.* (citing Fed. R. Civ. P. 8(a)(2)).  The court is "not bound to accept as true a legal conclusion couched as a factual allegation."  *Id.* at 678 (quotation and citation omitted).  And "bare assertions" that "amount to nothing more than a "formulaic recitation of the elements" of a claim "are conclusory and not entitled to be assumed true."  *Id.* at 681 (quotation and citation omitted).  Stated succinctly:

> Pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.  While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.  When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Id.* at 679.

2.    Eighth Amendment Standard

The Eighth Amendment's prohibition against cruel and unusual punishment, applicable to the States through the Due Process Clause of the Fourteenth Amendment, Robinson v. California, 370 U.S. 660, 82 S. Ct. 1417, 8 L. Ed. 2d 758 (1962), prohibits the "unnecessary and wanton infliction of pain," Hudson v. McMillian, 503 U.S. 1, 5, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992).   In the prison context, three distinct Eighth Amendment claims are available to plaintiff inmates alleging cruel and unusual punishment, each of which requires a different showing to establish a constitutional violation.  Danley v. Allen, 540 F.3d 1298, 1306 (11th Cir. 2008), *overruled in part on other grounds by* Iqbal, 556 U.S. 662, *as recognized in* Randall v. Scott, 610 F.3d 701 (11th Cir. 2010).  The Eighth Amendment can give rise to claims challenging specific conditions of confinement, the excessive use of force, and the deliberate indifference to a prisoner's serious medical needs.  *See* Thomas v. Bryant, 614 F.3d 1288, 1314 (11th Cir. 2010).   Each of these claims requires a two-prong showing:   an objective showing of a deprivation or injury that is "sufficiently serious" to constitute a denial of the "minimal civilized measure of life's necessities" and a subjective showing that the official had a "sufficiently culpable state of mind." Farmer v. Brennan, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994) (internal citations and quotations omitted).  Both of these inquiries are

contextual.  Because the Eighth Amendment "draws its meaning from the evolving standards of decency that mark the progress of a maturing society," the objective harm inquiry is contextual in that it is responsive to contemporary standards.  Hudson, 503 U.S. at 8 (internal citation and quotation omitted). Additionally, what is necessary to show sufficient harm and what is necessary to show a sufficiently culpable state of mind varies with the type of Eighth Amendment claim at issue.  Id. at 8–9.  All three types of claims are presented in the instant case; therefore all three standards will be discussed.

To make out a claim for an unconstitutional condition of confinement, "extreme deprivations" are required, whereas in the excessive-force context, contemporary standards of decency may be violated even where no significant injury is evident. Hudson, 503 U.S. at 9–10.  With respect to the subjective inquiry, in both prison conditions and medical needs cases, the relevant state of mind for purposes of liability is deliberate indifference.  Wilson v. Seiter, 501 U.S. 294, 303, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991).  Excessive-force claims, however, require a showing of a heightened mental state—that the defendants applied force "maliciously and sadistically for the very purpose of causing harm."  Id. at 302 (citing Whitley v. Albers, 475 U.S. 312, 320–21, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986)).

a.    Excessive Force

The "core judicial inquiry" for an excessive-force claim is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Wilkins v. Gaddy, 559 U.S. 34, 37, 130 S. Ct. 1175, 175 L. Ed. 2d 995 (2010) (internal citation and quotation omitted).  The Supreme Court has "rejected the notion that 'significant injury' is a threshold requirement for stating an excessive force claim."  *Id.* at (quoting Hudson, 503 U.S. at 7).  Thus, while de minimis uses of force, absent exceptional circumstances, do not violate the constitution, de minimis injury does not necessarily bar a prisoner's excessive-force claim.  Wilkins, 559 U.S. at 37–38.  In other words, a prisoner "does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury."  *Id.* at 38.  The extent of injury remains a relevant consideration and may provide an indication of the amount of force applied, but "[i]njury and force . . . are only imperfectly correlated, and it is the latter that ultimately counts."  *Id.* at 37–38.

The Eleventh Circuit has identified five factors to help evaluate whether force was applied maliciously or sadistically.  *See* Danley, 540 F.3d at 1307).  Those five factors include:  (1) the need for force; (2) the relationship between that need and the

amount of force used; (3) the extent of the resulting injury; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible official on the basis of facts known to that official; and (5) any efforts made to temper the severity of the use of force.  *Id.* (citing <u>Whitley</u>, 475 U.S. at 320–21); *see also* <u>Fennell v. Gilstrap</u>, 559 F.3d 1212, 1218–20 (11th Cir.  2009) (applying these factors).  When evaluating whether the force used was excessive, the court gives broad deference to prison officials acting to preserve discipline and security.  <u>Bennett v. Parker</u>, 898 F.2d 1530, 1533 (11th Cir.  1990).

In general, prison officers are authorized to use force when a prisoner repeatedly fails to obey an order.  <u>Danley</u>, 540 F.3d at 1307.  Officers are not required to convince every prisoner that their orders are reasonable and well-thought-out before resorting to force.  *Id.*

Moreover, the Eleventh Circuit recognized that "[p]epper spray is an accepted non-lethal means of controlling unruly inmates."  <u>Danley</u>, 540 F.3d at 1307  It is designed to be disabling without causing permanent physical injury and is a reasonable alternative to escalating a physical confrontation.  *Id.* at 1308.  Therefore, "[a] short burst of pepper spray is not disproportionate to the need to control an inmate

who has failed to obey a jailer's orders." *Id.* at 1307–08.  A "short" burst is around five seconds or less.  *See id.* (collecting cases).

b.   <u>Conditions of Confinement</u>

"The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones . . . ." <u>Farmer</u>, 511 U.S. at 832 (internal quotation and citation omitted).  Thus, in its prohibition of "cruel and unusual punishments," the Eighth Amendment requires that prison officials provide humane conditions of confinement. *Id.*  However, as noted above, only those conditions which objectively amount to an "extreme deprivation" violating contemporary standards of decency are subject to Eighth Amendment scrutiny.  <u>Hudson</u>, 503 U.S. at 8–9.  Furthermore, it is only a prison official's subjective deliberate indifference to the substantial risk of serious harm caused by such conditions that gives rise to an Eighth Amendment violation. <u>Farmer</u>, 511 U.S. at 828 (internal citation and quotation omitted); <u>Wilson</u>, 501 U.S. at 303.

In conditions-of-confinement cases, wantonness is established by proving that a defendant prison official was deliberately indifferent to a risk of serious harm to the plaintiff inmate.  <u>Farmer</u>, 511 U.S. at 828 (internal citation and quotation omitted); <u>Wilson</u>, 501 U.S. at 303; <u>LaMarca v. Turner</u>, 995 F.2d 1526, 1535 (11th Cir. 1993).

In the Eleventh Circuit, to find deliberate indifference on the part of a prison official, a plaintiff inmate must show:  (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence.  Townsend v. Jefferson Cnty., 601 F.3d 1152, 1158 (11th Cir. 2010); *see also* Chandler v. Crosby, 379 F.3d 1278, 1290, n. 21 (11th Cir. 2004).  That is, the evidence must demonstrate that "with knowledge of the infirm conditions, [the official] knowingly or recklessly declined to take actions that would have improved the conditions." LaMarca, 995 F.2d at 1537.  A prison official's deliberate indifference is a question of fact.  *See* Farmer, 511 U.S. at 842; Goebert v. Lee Cnty., 510 F.3d 1312, 1327 (11th Cir. 2007). "Whether a prison official had the requisite knowledge of a substantial risk is . . . subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."  Farmer, 511 U.S. at 842 (internal citations omitted).

### c.    Deliberate Indifference to Serious Medical Needs

"A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Mann v. Taser Int'l, Inc., 588 F.3d

1291, 1307 (11th Cir. 2009) (quotation omitted).  A serious medical need may also be found when the need is worsened by a delay in treatment.  *Id.*  Either way, the medical need must be one that, if left unattended, poses a substantial risk of serious harm.  *Id.* Deliberate indifference requires a showing of subjective knowledge of a risk of serious harm and disregard of that risk by conduct that is more than gross negligence. Danley, 540 F.3d at 1312.  In the Eleventh Circuit, conduct deliberately indifferent to serious medical needs has included:  (1) grossly inadequate care; (2) a decision to take an easier but less efficacious course of treatment; and (3) medical care that is so cursory as to amount to no treatment at all.  Melton v. Abston, 841 F.3d 1207, 1223 (11th Cir. 2016) (internal citations and quotation marks omitted).  A defendant who unreasonably fails to respond or refuses to treat an inmate's need for medical care or one who delays necessary treatment without explanation or for non-medical reasons may also exhibit deliberate indifference.  *Id.*

3.    Qualified Immunity

"When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law."  Ashcroft v. al–Kidd, 563 U.S. 731, 743, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011) (internal citation and quotation marks omitted).  This defense shields government officials performing discretionary

acts "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982).  In part, this defense recognizes the problems that government officials like police officers and correctional officers face in performing their jobs in dynamic and sometimes perilous situations.  It is also designed to avoid excessive disruption of government services and to provide a direct way to end insubstantial claims on summary judgment.  *Id.*

But the clearly established law requirement serves another purpose.  It provides government officials with the ability to anticipate what conduct will give rise to liability for a constitutional violation.  *See* Anderson v. Creighton, 483 U.S. 635, 646, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987). To that end, when officials are acting within their discretionary capacity, they "can know that they will not be held personally liable as long as their actions are reasonable in light of current American law."  *Id.* As a consequence, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Id.* at 640.  This imposes an objective standard, and that objective standard is "measured by reference to clearly established law."  Harlow, 457 U.S. at 818.

Because this objective standard is fundamental to the qualified immunity defense, the district court should determine if the law was clearly established at the time the incident occurred.  As the Supreme Court explained:

> If the law at the time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful . . . . If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct.

Harlow, 457 U.S. at 818–19.

In this way, both government officials and citizens are protected.  If the law is not clearly established, then the court should dismiss the case against the government official.  If the law was clearly established, then the claim against the government official should go forward.

Authoritative judicial decisions may "establish broad principles of law" that are clearly applicable to the conduct at issue, and it may also be obvious from "explicit statutory or constitutional statements" that certain conduct is unconstitutional. Griffin Indus., Inc. v. Irvin, 496 F.3d 1189, 1209 (11th Cir. 2007); *see also* Taylor v. Barkes, —— U.S. ——, 135 S. Ct. 2042, 2044, 192 L. Ed. 2d 78 (2015) ("We do not require a case directly on point, but existing precedent must have placed the . . . constitutional question beyond debate.").  Furthermore, recognizing that the clearly established law

question turns on the law at the time of the incident, the district court must consider the law "in light of the specific context of the case, not as a broad general proposition . . . ." Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). In other words, the facts of the case before the court must be materially similar to the facts in the precedent that clearly establishes the deprivation.  *See* Merricks v. Adkisson, 785 F.3d 553, 559 (11th Cir. 2015) (citation omitted).  To be clearly established, the precedent must give officials clear warning of unconstitutional conduct.  *Id.*

In considering the law to do this analysis, the district court should compare the facts of the case before the court that allege a constitutional deprivation with those cases that the party opposing the motion contends show the clearly established nature of the law.  As the Eleventh Circuit has explained:

> For qualified immunity purposes, a pre-existing precedent is materially similar to the circumstances facing the official when the specific circumstances facing the official are enough like the facts in the precedent that no reasonable, similarly situated official could believe that the factual differences between the precedent and the circumstances facing the official might make a difference to the conclusion about whether the official's conduct was lawful or unlawful, in the light of the precedent.  Thus, every fact need not be identical.  Minor variations in some facts (the precedent lacks arguably significant fact or contains an additional arguably significant fact not in the circumstances now facing the official) might be very important and, therefore, be able to make the circumstances facing an official materially different than the pre-existing

precedents, leaving the law applicable—in the circumstances facing the
official—not clearly established when the defendant acted."

Merricks, 785 F.3d at 559 (internal quotation marks omitted).

The Supreme Court recently observed:

> In the last five years, this Court has issued a number of opinions
> reversing federal courts in qualified immunity cases. The Court has
> found this necessary both because qualified immunity is important to
> society as a whole, and because as an immunity from suit, qualified
> immunity is effectively lost if a case is erroneously permitted to go to
> trial.

> Today, it is again necessary to reiterate the longstanding principle
> that "clearly established law" should not be defined at a high level of
> generality. As this Court explained decades ago, the clearly established
> law must be "particularized" to the facts of the case. Otherwise,
> plaintiffs would be able to convert the rule of qualified immunity into a
> rule of virtually unqualified liability simply by alleging violation of
> extremely abstract rights.

White v. Pauly, — U.S. —, 137 S. Ct. 548, 551–52, 196 L. Ed. 2d 463 (2017)

(multiple citations, some quotation marks, and alterations omitted).

Furthermore, the court cannot consider just any case law to decide if a right was

clearly established. Only binding opinions from the United States Supreme Court, the

Eleventh Circuit Court of Appeals, and the highest court in the state where the action

is filed, can serve as precedent for this analysis. McClish v. Nugent, 483 F.3d 1231,

1237 (11th Cir. 2007).

B.    D'Alessandro's Factual Allegations

The relevant facts, taken from D'Alessandro's Second Amended Complaint (ECF No. 11) and assumed as true at the motion to dismiss stage, *see* Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993), are these. D'Alessandro is a diagnosed schizophrenic.  On April 5, 2016, he was housed at Santa Rosa Correctional Institution.  At approximately 9:30 a.m., D'Alessandro declared a psychological emergency.  Defendant Sergeant Stephens and another officer applied restraints, including hand restraints, and escorted D'Alessandro from his cell to the "group room" to speak with a mental health specialist.  D'Alessandro informed the specialist that he was experiencing suicidal ideations and hallucinations.  The mental health specialist told D'Alessandro that there were no Self Harm Observation Status ("SHOS") cells available in the "Multi-Service Building," so instead, D'Alessandro would remain housed in his current cell and placed on "Procedure Enhancement," also known as property restriction.  Property restriction involves the removal of the inmate's clothing (except boxer shorts), bedding, linens, and personal property from

his cell for a period of 72 hours.[4]  D'Alessandro alleges Santa Rosa C.I. had a "de facto policy" of placing inmates on property restriction instead of in SHOS cells.

D'Alessandro was escorted to a temporary holding cell, and Defendant Stephens ordered D'Alessandro to remove his clothing except his boxer shorts. Instead of complying with the order, D'Alessandro declared another psychological emergency.  Defendants Taylor, Gaynor, and Schrock, all of whom are lieutenants, ordered D'Alessandro to provide the hand restraints and strip down to his boxers to be placed on property restriction.   Instead, D'Alessandro declared another psychological emergency, because he was "in extreme mental distress" and "experiencing a psychological episode."   Defendant Gaynor then informed D'Alessandro that Defendant Warden Coker had authorized the use of a chemical agent and forced extraction from the temporary holding cell.  D'Alessandro was then subjected to the use of a chemical agent and extracted from the holding cell.

---

[4] FDOC policy provides:

If items of clothing, bedding or personal property are removed in order to prevent the inmate from inflicting injury to him or herself or others, to prevent the destruction of property or equipment, or to prevent the inmate from impeding security staff from accomplishing functions essential to the unit and institutional security, staff shall re-assess the need for continued restriction every 72 hours thereafter.  The warden, based on this assessment, will make the final determination on the continued denial or return of the items.  The items will be returned to the inmate when no further behavior or threat of behavior of the type leading to the restriction has occurred.

Fla. Admin. Code r. 33-601-800(10)(c).

D'Alessandro believes that each Defendant was aware that chemical agent was applied.

D'Alessandro states he did not have the mental capacity to comply with Defendants' orders.  D'Alessandro states that the fact that the mental health specialist placed him on "procedure enhancement" suggests that she recognized, "with her professional judgment," that D'Alessandro required a higher mental health classification.  D'Alessandro states he believes that his mental health classification was raised to an "S-4 or S-5."  D'Alessandro states FDOC policy provides that inmates with a mental health classification of S-4 or S-5 are not to be subjected to the non-spontaneous use of chemical agent.

D'Alessandro states after he was sprayed with chemical agent, he was provided a decontamination shower, but he was only permitted to rinse his face because he was in restraints.  D'Alessandro states he then underwent a post use-of-force medical examination, during which he informed Defendant Nurse Rosati that he had not been provided a sufficient decontamination shower, that he had chemical agent all over his entire body, and that the chemical agent was severely burning his skin and eyes and affecting his breathing.

D'Alessandro was returned to his original cell and placed on property restriction.  Defendant Stephens turned off the water supply to D'Alessandro's cell.  At that point, D'Alessandro was not combative or resistant to any order.  D'Alessandro states he was exposed to the lingering effects of the chemical agent for "a protracted period of time" without an opportunity to decontaminate himself.  D'Alessandro states the extended exposure to chemical agent exacerbated his mental illness, causing him to suffer psychologically.

C.    <u>Discussion</u>

Initially, Defendants contends they were acting within the scope of their discretionary authority when the alleged harm occurred (*see* ECF No. 34 at 3; ECF No. 47 at 2; ECF No. 48 at 3).  "To determine whether an official was engaged in a discretionary function, we consider whether the acts the official undertook 'are of a type that fell within the employee's job responsibilities.'"  <u>Crosby v. Monroe Cnty.</u>, 394 F.3d 1328, 1332 (11th Cir. 2004) (quotation omitted).  In applying this test, "we look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally

inappropriate circumstances." <u>Holloman ex rel. Holloman v. Harland</u>, 370 F.3d 1252, 1266 (11th Cir. 2004).

Here, there is no genuine issue of material fact concerning whether inmate care, discipline, and control is a primary job responsibility for Defendants Schrock, Gaynor, Coker, Stephens, and Taylor. Therefore, the undersigned concludes that their acts—regardless of whether these acts were improper—were well within the scope of their discretionary authority.

1. <u>Use of Chemical Agent</u>

D'Alessandro claims that Defendants Taylor, Gaynor, Schrock, Stephens, and Coker violated the Eighth Amendment by subjecting him to the non-spontaneous use of chemical agent when he had a mental health classification of S-4 or S-5 and was experiencing a psychotic episode (*see* ECF No. 11 at 9). Defendants contend D'Alessandro has failed to prove that their conduct violated clearly established law (*see* ECF No. 34 at 3–4; ECF No. 47 at 3; ECF No. 48 at 3–4). In D'Alessandro's responses to Defendants' motions to dismiss, he does not cite any cases, let alone cases that show the clearly established nature of the law on April 5, 2016, thus the court has located the relevant cases for him (*see* ECF Nos. 39, 53, 54).

In Thomas v. Bryant, the Eleventh Circuit considered whether the FDOC's non-spontaneous use-of-force policy, as applied to a particular inmate, Inmate McKinney, during his incarceration on a close-management wing of Florida State Prison ("FSP") from 2001–2007, subjected him to an unconstitutional condition of confinement.[5] Thomas, 614 F.3d at 1304–06.  The FDOC policy permitted corrections officers to release chemical agents through the food flap of cells as a means of disciplining disruptive prisoners who refused to comply with prison regulations.  Thomas, 614 F.3d at 1296.  Although the policy required an officer to first confer with a direct supervisor, FDOC medical personnel, and the warden for authorization to use chemical agents in the particular instance on the specific inmate, the policy did not require the officer to confer with mental health staff.  Id. at 1297.

The material facts in Thomas were that Inmate McKinney's mental health record demonstrated that he had mentally decompensated (meaning, he was unable to understand or comply with orders of FDOC officials) at the times he was sprayed with chemical agents, and that on many occasions, he exhibited "unambiguous symptoms of decompensation" immediately prior to the chemical sprayings.  Thomas, 614 F.3d

---

[5] The case involved multiple plaintiffs, with inmate Jeremiah Thomas named as the lead plaintiff.  Mr. Thomas died during the appellate proceedings; therefore, the Eleventh Circuit's decision concerned only the FDOC policy as applied to plaintiff McKinney.

at 1308.  During the period in question (from 2001–2007), McKinney experienced frequent psychological emergencies, including suicide attempts, suicidal threats and ideations, self-injurious behavior, and psychotic episodes.  *Id.* at 1309.  McKinney's mental health record demonstrated that he was reclassified from "S–3" status to S-4 or S-5 status on at least two occasions during his treatment at Union Correctional Institution (a facility focused on <u>inpatient</u> psychiatric care that housed S-3, S-4, and S-5 inmates), and McKinney was also transferred between FSP, the FSP infirmary, and Union C.I. seventeen times during the five-year period between 2002 and 2007. *Id.*

The court applied the deliberate indifference standard to McKinney's claim. With regard to the objective component of the deliberate indifference standard, the Eleventh Circuit affirmed the district court's conclusion that McKinney's "well-documented history of mental illness and psychotic episodes rendered him unable to comply at the times he was sprayed such that the repeated use of chemical agents was 'unnecessary' and 'without penological justification in his specific case.'"  *Id.* at 1310–11 (quoting <u>Danley</u>, 540 F.3d at 1311).  The Eleventh Circuit agreed with the district court's conclusion that "if the DOC fails to account for an inmate's decompensation, with the result that he is gassed when he cannot control his actions

due to his mental illness, then the force no longer has a necessary penological purpose and becomes brutality." *Id.* at 1311 (internal citation and quotation marks omitted).

The Eleventh Circuit held:

> [T]he policy and practice of spraying inmates with chemical agents, as applied to McKinney under the circumstances found here—i.e., when he was fully secured in his seven-by-nine-foot steel cell, when he was not presenting a threat of immediate harm to himself or others, and when he was unable to understand and comply with officers' orders due to his mental illness—are extreme deprivations violating the broad and idealistic concepts of dignity, civilized standards, humanity and decency embodied in the Eighth Amendment.

Thomas, 614 F.3d at 1312 (citation and internal quotation marks omitted).

The Eleventh Circuit then proceeded to the subjective component of the deliberate indifference standard, and held that FDOC officials had subjective knowledge that McKinney was in a category of inmates whose mental health was "particularly fragile" and that "notwithstanding his S-3 designation, he was especially susceptible to decompensating," and that officials had subjective knowledge of a risk of harm specific to McKinney.  Thomas, 614 F.3d at 1314.  The Eleventh Circuit affirmed the district court's finding that the record demonstrated that FDOC officials "turned a blind eye" to McKinney's mental health needs and the obvious danger that the use of chemical agents presented to his psychological well-being.  *Id.* at 1316.

The Eleventh Circuit upheld the following permanent injunction imposed by

the district court:

> In the event that plaintiffs Jeremiah Thomas or Michael McKinney are
> placed in the Florida State Prison (FSP) Close Management (CM) wing,
> defendants Walter McNeil, as Secretary of the Florida Department of
> Corrections, and Randall Bryant, as Warden of the Florida State Prison,
> in their official capacities, are enjoined from allowing the
> nonspontaneous application of chemical agents to plaintiffs Thomas or
> McKinney without first consulting with DOC's trained mental health
> staff so that a mental health professional can determine whether the
> application of the chemical agents is dangerous to the inmate's
> wellbeing, likely to exacerbate the current crisis or whether, on account
> of mental illness, the inmate is currently unable to conform his conduct
> to comply with the directives being given to him by correctional staff.
> Once contacted, the mental health professional will use his or her
> professional judgment to determine whether the non-spontaneous use of
> chemical agents is contraindicated for that inmate at that time (similar to
> the prior consultations which now occur with medical staff before
> non-spontaneous application of chemical agents is permitted).  If, after
> consultation, the mental health professional deems the use of chemical
> agents to be contraindicated, chemical agents may not be employed at
> that time.

Thomas, 614 F.3d at 1322.

D'Alessandro states that the fact that the mental health specialist placed him on

"procedure enhancement" suggests that she recognized "with her professional

judgment" that D'Alessandro required a higher mental health classification.

D'Alessandro states he believes that the mental health specialist raised his

classification to an S-4 or S-5 grade.  D'Alessandro also states FDOC policy provides

that inmates with either of those mental health classifications are not to be subjected to non-spontaneous uses of chemical agents.

However, D'Alessandro's allegations in a prior pleading contradict these allegations with regard to the mental health specialist's determinations.  In his initial Complaint, submitted under the penalty of perjury, D'Alessandro stated that after he initially talked to the mental health specialist in the "group room," he was placed in the temporary holding cell while the mental health specialist consulted with a mental health doctor regarding D'Alessandro's placement in a SHOS cell (*see* Complaint, ECF No. 1 at 6, 11).  D'Alessandro alleged that the mental health specialist then came to the holding cell and "advised me that there is no need to send me to the [self-harm] observation cell.  I need to comply with security." (*id.*).

The salient question here is whether the state of the law on April 5, 2016, gave Defendants fair warning that the application of a chemical agent on D'Alessandro was unconstitutional.  *See* Hope v. Pelzer, 536 U.S. 730, 741, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002).  The undersigned concludes that it did not.  The facts alleged by D'Alessandro are not materially similar to the facts of Thomas. Indeed, Thomas lacks one significant fact that was present in the circumstances facing Defendants in the instant case.  Unlike in Thomas, Defendants did not apply chemical agents until after

D'Alessandro was evaluated by a mental health specialist, and <u>after</u> the mental health specialist told D'Alessandro that he did not need to be placed in an SHOS cell, and that he needed to comply with security officers.  These facts do not plausibly suggest that any Defendant knew that D'Alessandro's mental state rendered him unable to comply with their orders.[6]

---

[6] The FDOC's use-of-force policy in effect on April 5, 2016, did not require correctional officers to involve a mental health professional prior to the use of chemical agents on inmates with a S-2 or higher mental health classification.  *See* Fla. Admin. Code r. 33-602-210 (effective 11/5/2013).  Effective January 10, 2018, the use-of-force policy changed, and now provides:

> 2.  When an inmate in a controlled condition creates a disturbance, or the officer's ability to provide unit security is adversely impacted by an inmate's behavior, and the inmate refuses to comply with clear and audible orders to cease his or her behavior, the following steps will be followed unless there is an emergency or other circumstances arise that would dictate alternative actions.
>
> a.  The housing unit supervisor will counsel with the inmate, ordering compliance with lawful commands or cessation of the behavior that would justify using force.
>
> b.  If the inmate remains non-compliant, the confinement lieutenant, close management lieutenant, or shift supervisor will counsel with the inmate, ordering compliance with lawful commands or cessation of the behavior that would justify using force.
>
> c.  If the inmate remains non-compliant, prior to issuance of a final order to an inmate ordering compliance or cessation of the behavior that would justify using force, the confinement lieutenant, close management lieutenant or shift supervisor shall have control room staff check the Bed Inventory List to ascertain whether the inmate involved is classified as S-2 or higher.  During regular work hours, if the involved inmate is S-2 or higher, the housing lieutenant or shift supervisor shall have a qualified mental health professional, if available, or CIT-trained security staff member provide crisis intervention and attempt to de-escalate the situation and prevent a use of force.

Fla. Admin. Code r. 33-602-210(5)(c)2.c.

Further, there is no dispute that D'Alessandro did not comply with the officers' orders.  D'Alessandro admits that not once but twice the officers ordered him to provide the hand restraints and strip to his boxer shorts, and he refused to comply with the orders on both occasions.  The state of the law on April 5, 2016, did not give Defendants fair warning that the application of chemical agent, under the circumstances described by D'Alessandro, constituted deliberate indifference.  And since the deliberate indifference standard has a lower mental state requirement than an excessive force claim, *see* <u>Thomas</u>, 614 F.3d at 1304 (citing <u>Wilson</u>, 501 U.S. at 302, 303), D'Alessandro's Eighth Amendment claim cannot survive under the excessive force standard either.  Therefore, Defendants Stephens, Taylor, Schrock, Gaynor, and Coker, are entitled to qualified immunity as to D'Alessandro's Eighth Amendment claim with respect to the application of chemical agent.

### 2.    <u>Failure to Provide Adequate Decontamination</u>

In D'Alessandro's Second Amended Complaint, he claims that Defendants Taylor, Gaynor, Schrock, and Stephens engaged in excessive force by maliciously and sadistically refusing to provide him an adequate decontamination shower after the application of chemical agent (*see* ECF No. 11 at 9).   He also claims that Stephens subjected him to cruel and unusual punishment by turning off the water supply to his

cell upon his return from the medical department (*see id.*).  In D'Alessandro's responses to Defendants' motions to dismiss, D'Alessandro adds a deliberate indifference claim with respect to the failure to provide an adequate decontamination shower (*see* ECF No. 54 at 3).  And he extends the water supply claim to Schrock and Gaynor by alleging he "notified Schrock and Gaynor, to which [sic] no assistance was given to turn the cell water back on" (*see* ECF No. 39 at 2).  D'Alessandro alleges "after the fact," he was treated with burn cream, eye wash, and nasal and lung decongestants (*id.*).

In Danley, the Eleventh Circuit held that even when an initial pepper spraying is constitutional, prison officers may still violate the constitution by failing to temper the severity of the initial forceful response.  540 F.3d at 1308–09.  For example, subjecting a prisoner to special confinement that causes him to suffer increased effects of environmental conditions can constitute excessive force.  *Id.*  Pepper spray acts "by causing intense pain, a burning sensation that causes mucus to come out of the nose, an involuntary closing of the eyes, a gagging reflex, and temporary paralysis of the larynx."  *Id.* at 1309 (citations and internal quotation marks omitted).  "Once a prisoner has stopped resisting there is no longer a need for force, so the use of force thereafter is disproportionate to the need."  *Id.*

The plaintiff in <u>Danley</u> alleged that the defendant jailers had sprayed him at close range for three to five seconds in the doorway of a small, poorly ventilated cell, and pushed him into that small cell for about twenty minutes, while he screamed he could not breath and the jailers laughed at him.  540 F.3d at 1304.  The jailers then allowed him a two-minute shower and returned him to a group cell, which was also insufficiently ventilated.  *Id.*  Danley alleged that he had suffered chemical conjunctivitis and bronchospasms because of the delay in treatment.  *Id.* at 1305.

The <u>Danley</u> court held that the use of force in the form of extended confinement in the same small, poorly ventilated, pepper-spray filled cell (i.e., the same cell in which the chemical agent was initially sprayed), when the inmate is no longer resisting and where there are other readily available alternatives, was excessive.  *Id.* And the court determined that the fact that officers mocked Danley while he suffered, parodying his choking, and left him there for twenty minutes, and then did not allow him the amount of time to shower required by jail policy, indicated that the officers acted "maliciously and sadistically for the very purpose of causing harm," instead of in "a good faith effort to maintain or restore discipline."  *Id.* at 1309–10 (internal citation and quotation marks omitted).

In the instant case, D'Alessandro was not confined in the same small, poorly ventilated, pepper-spray filled cell immediately after he was sprayed with chemical agent.  Instead, he was removed from the holding cell, permitted to rinse his face, taken to the medical department for examination, and then placed in an uncontaminated cell.  D'Alessandro does not allege any facts suggesting that the nurse who evaluated him informed any Defendant that additional decontamination measures, in the form of a "full body" shower or other access to water, was necessary.  Although D'Alessandro alleges that "after the fact" he received burn cream, eye wash, and decongestants, he does not allege that during the period between the time of his medical examination and placement in the cell, and the time he received the burn cream and other treatment, he either exhibited or described to Stephens, Schrock, or Gaynor, a need for further decontamination or medical treatment.

The state of the law on April 5, 2016, did not give Defendants fair warning that the failure to provide a "full body" shower, or the termination of the water supply to the uncontaminated cell, after the application of chemical agent in the temporary holding cell, face wash, and medical evaluation, constituted excessive force. Therefore, Defendants are entitled to qualified immunity on this excessive force claim.

D'Alessandro also contends, as did the plaintiff in <u>Danley</u>, that Defendants' failure to provide a "full body" decontamination shower and the termination of the water supply to the uncontaminated cell constituted deliberate indifference.   Inmate Danley claimed that the defendant jailers acted with deliberate indifference to a serious medical need when they refused to allow him to adequately decontaminate himself and to see a jail nurse.   *See* 540 F.3d at 1310.   In holding that Danley had stated a claim, the Eleventh Circuit stressed that "[t]he serious medical needs Danley alleges . . . are the effects of prolonged exposure to pepper spray with inadequate decontamination and poor ventilation, not the immediate effects of the pepper spray." *Id.* at 1311.   As for deliberate indifference, the Eleventh Circuit said that "[t]he allegations in the complaint are that the jailers took only ineffective measures to remedy the need and then mocked Danley and ignored his pleas for help." *Id.* at 1313. The court also noted that the jailers allowed Danley only a two-minute decontamination shower, while the jail's own policy required a fifteen-minute shower in order to ameliorate the effects of the spray.   *Id.* at 1312.   Concluding that Danley had stated a clearly established serious medical need and the jailers' deliberate indifference, the court stated simply that "the jailers forced Danley to wait for too long

before allowing him to shower," which resulted in needless pain, breathing problems, and inflamed eyes.  *Id.* at 1311.

Here, unlike in <u>Danley</u>, Defendants <u>did</u> allow D'Alessandro to see a nurse after the allegedly inadequate decontamination shower (i.e., the opportunity to rinse his face).  As previously discussed, D'Alessandro does not allege any facts suggesting that the nurse informed any Defendant that additional decontamination measures were necessary.  *See* <u>Keith v. DeKalb Cnty., Ga.</u>, 749 F.3d 1034, 1050 (11th Cir. 2014) (institutional staff who are not medical providers are not liable when they rely on the medical expertise of medical staff; the law does not require that non-medical officials ignore the determination and recommendation of medical staff, unless there is direct evidence to show that a prison official should not rely on this expertise).  Additionally, although D'Alessandro alleges that "after the fact" he received burn cream, eye wash, and decongestants, he does not allege that during the period between the time of his medical examination and placement in the cell, and the time he received the burn cream and other treatment, he either exhibited or described to Stephens, Schrock, or Gaynor, a need for further decontamination or medical treatment.

The state of the law on April 5, 2016, did not give Defendants fair warning that failing to provide additional means for decontamination (i.e., a "full body" shower or

access to water in the cell) constituted deliberate indifference.  Therefore, Defendants

Taylor, Gaynor, Schrock, and Stephens are entitled to qualified immunity on

D'Alessandro's deliberate indifference claim.  *Cf.* <u>McNeeley v. Wilson</u>, 649 F. App'x

717, 722–23 (11th Cir. 2016) (unpublished by recognized as persuasive authority)

(based on <u>Danley</u>, defendant officers were on notice that delaying proper

decontamination could result in clearly established constitutional violation where

record contained evidence that officers knew that inmate had been pepper-sprayed,

inmate was able to only partially self-decontaminate in his cell by putting water on his

eyes, inmate complained loudly about the effects of pepper spray an hour later when

officers were putting him into restraint chair, and officers were aware that inmate was

not allowed to decontaminate his person for four hours).

In sum, Defendants Taylor, Gaynor, Schrock, and Stephens are entitled to

qualified immunity on D'Alessandro's Eighth Amendment claim based upon their

failure to provide a "full body" shower or access to water in the cell, whether stated

as an excessive force claim or a deliberate indifference claim.[7]  Therefore, their

motions to dismiss should be granted as to this claim.

---

[7] D'Alessandro does not assert an Eighth Amendment claim against Defendant Coker with
respect to the allegedly inadequate decontamination procedures.  Even if he did, he does not allege
any facts suggesting a plausible basis for holding Warden Coker liable for the conduct of his
subordinates with respect to the decontamination procedures.

Accordingly, it is respectfully **RECOMMENDED**:

1.     That the motions to dismiss filed by Defendants Coker, Stephens, Taylor, Schrock, and Gaynor (ECF Nos. 34, 47, 48) be **GRANTED**, and Plaintiff's claims against these Defendants be **DISMISSED**.

2.     That Plaintiff's motions for default and default judgment (ECF No. 50) be **DENIED**.

3.     That this case be remanded to the undersigned for further proceedings on Plaintiff's deliberate indifference claim against Defendant Nurse Rosati.

At Pensacola, Florida this 8th day of May 2018.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**


**<u>NOTICE TO THE PARTIES</u>**

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.   <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>   A copy of objections shall be served upon all other parties.   If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.   *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**